FILED
2017 Feb-24  PM 03:40
U.S. DISTRICT COURT
N.D. OF ALABAMA



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

| | | |
|---|---|---|
| TONIO MCCALISTER, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Case No.  3:14-cv-01569-HGD |
| | ) | |
| TENNESSEE VALLEY AUTHORITY | ) | |
| BOARD OF DIRECTORS, et al., | ) | |
| | ) | |
| Defendants | ) | |

## <u>MEMORANDUM OPINION</u>

The above-entitled civil action is before the court on the motion for summary judgment filed by defendant, Tennessee Valley Authority Board of Directors (TVA).[1] (Doc. 20).   The parties have consented to the exercise of jurisdiction by the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c) and LR 73.2.  (Doc. 23).

Plaintiff Tonio McCalister began working for TVA as an electrician in 2002. In 2008, she applied for and was promoted to a foreman position at TVA's Power Service Shop.  On May 19, 2013, plaintiff lost her foreman position and was demoted back to an electrician position following a clearance violation, which is a type of

---

[1] Plaintiff also named as defendants the chairman and individual members of the Tennessee Valley Authority Board of Directors.  (Doc. 1 at ¶ 2).

safety violation, at one of TVA's power plants. Plaintiff alleges TVA subjected her to a hostile work environment from 2008 to 2013 and further alleges she filed a complaint with TVA's Equal Employment Opportunity office on May 14, 2013, just five days before her demotion. She asserts claims against TVA for alleged gender discrimination, hostile work environment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e *et seq*. (Title VII). (Doc. 1).

Subsequent to discovery in this matter, TVA filed a motion for summary judgment to which plaintiff has responded and TVA replied. (*See* Docs. 20, 21, 22, 24, 25 & 26). Thus, the matter is now ready for disposition. After careful consideration of the parties' submissions, and for the reasons stated below, TVA's motion for summary judgment will be granted in part and denied in part.

## SUMMARY JUDGMENT STANDARD

Summary judgment "shall [be granted] if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The movant carries the initial burden of "informing the court of the basis for its motion and of identifying those materials that demonstrate the absence of a genuine issue of material fact." *Rice-Lamar v. City of Ft. Lauderdale*, 232 F.3d 836, 840 (11th Cir. 2000) (citing *Celotex Corp. v. Catrett*,

477 U.S. 317, 323 (1986)).  "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

To show a genuine issue of material fact, the non-movant must "go beyond the pleadings" and present competent evidence in the form of affidavits, depositions, admissions and the like designating "specific fact showing there is a genuine issue for trial." *Celotex*, 477 U.S. at 324.  A genuine issue of material fact is shown when the non-movant produces evidence so that a reasonable factfinder could return a verdict in his or her favor.  *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007).  Speculation or conjecture cannot create a genuine issue of material fact.  *Cordoba v. Dillards, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005).  "The mere existence of a scintilla of evidence" supporting the non-movant's case is insufficient to defeat a properly-supported motion for summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In deciding a motion for summary judgment, a court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.  *Liberty Lobby*, 477 U.S. at 248.  The evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his or

her favor. *Id.* at 255.  However, "facts must be viewed in the light most favorable to the non-moving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed.R.Civ.P. 56(c)(3).

### FACTUAL BACKGROUND

The court finds the following undisputed facts.  Where any facts are disputed, they are viewed in the light most favorable to plaintiff.

## A.   TVA's Power Service Shop

TVA provides electricity for several million people in seven southeastern states.  TVA's Power Service Shop (PSS), where plaintiff worked at times relevant to this action, is located in Muscle Shoals, Alabama, and provides maintenance services for its clients, which include TVA's power generation plants and transmission systems.  (Doc. 21-6 at 13; Doc. 21-1 at 1).[2]  Crews with PSS's roving maintenance organization travel to different work sites to perform maintenance services for PSS's clients.  (Doc. 21-1 at 5-6).

PSS's work load fluctuates based on the needs of its clients.  Therefore, PSS has few TVA employees acting in permanent roles, and it depends heavily on contract

---

[2] References herein to "(Doc. __ at __ )" are to the electronic document and page numbers assigned by the Clerk of the Court.

employees and TVA employees acting in temporary roles. (Doc. 21-1 at 2). PSS assigns TVA employees to temporary foreman roles as needed for its roving maintenance crews, often to lead crews of contract employees.[3] (*Id.* at 3). TVA employees working in temporary roles as a foreman or lead foreman have the same supervisory status and authority as a permanent foreman or lead foreman. (Doc. 25-9 at 3).

One way PSS assigns an employee to a temporary role is to allow the employee to work in a "dual-rate" status, meaning the employee works in a foreman or lead foreman position on a limited, as-needed basis and is paid the foreman or lead foreman wage rate for the days or hours he or she performs such work. (Doc. 21-1 at 2). When an employee works as a foreman or lead foreman in a dual-rate status, TVA simply designates the days and hours he or she spent performing foreman or lead foreman work on the employee's timesheet, and no formal paperwork, such as an application, is completed. (*Id.*).

Another way PSS may assign an employee to a temporary role as a foreman or lead foreman is to temporarily promote the employee to a foreman or lead foreman

---

[3] PSS's roving maintenance crews are led by two types of foreman: regular and lead. A regular foreman heads a single roving maintenance crew and reports to a lead foreman. (Doc. 21-6 at 9). A lead foreman is in charge of several crews, each of which is headed by a regular foreman, and the lead foreman is also responsible for other planning and budget duties. (*Id.*).

position for a certain term, such as six months or a year. (*Id.* at 4). Temporarily promoted employees are paid at a foreman or lead foreman wage rate throughout the term of their temporary position. (*Id.*). Unlike with working in a dual-rate status, a temporary promotion is handled by TVA management, requires formal paperwork, and is noted in the employees official job history. (*Id.*).

## B.   **Plaintiff's work history with TVA**

Plaintiff, an African-American woman, began working at TVA in 2002 as an electrician at the Allen Steam Plant in Memphis, Tennessee. (Doc. 21-6 at 6). In 2008, plaintiff applied for and was promoted to a foreman position in PSS's roving maintenance organization. (*Id.* at 7-10). Plaintiff testified that she believes she was promoted to a permanent foreman position. (*Id.* at 8). However, TVA characterizes her promotion as temporary, and TVA employment records reflect the temporary nature of plaintiff's foreman position. (Doc. 21-11; Doc. 21-12). Beginning in January 2012, plaintiff began working as a lead foreman in a dual-rate status, and she worked as a lead foreman for PSS on an as-needed basis between January 2012 and May 2013. (Doc. 21-6 at 10-12).

Between 2008 and May 2013, plaintiff worked solely as a foreman or lead foreman for PSS, and she supervised numerous jobs at TVA plants in Alabama, Kentucky, Mississippi, and Texas. (*Id.*). During that time, she completed all her jobs

on budget and on time, and she received good performance reviews from TVA. (*Id.* at 17).

## C. Plaintiff's alleged hostile work environment

### 1. Harassment by employees on plaintiff's crews

Plaintiff claims she was subjected to a hostile work environment during the time she worked for PSS's roving maintenance organization. She asserts that employees on her work crews harassed her and that their harassing behavior contributed to her hostile work environment. First, plaintiff testified the employees "constantly" called her a "bitch," and she stated, "[i]t was a normal practice. If they [were] talking in reference to me, that's what I was." (Doc. 21-6 at 35-36). Plaintiff also testified that the employees called her other gender-specific derogatory terms and asserts "[t]he insults went on pretty much every day for years." (*Id.* at 36; Doc. 25-1 at 7). Plaintiff could only remember the names of three specific contract employees who called her derogatory names, but she also testified she heard other employees call her derogatory names outside of her work trailer. (Doc. 21-6 at 36). Rodney Thompson, a TVA employee, stated that he heard employees on plaintiff's crews call her a "bitch," "whore" and "control freak" while plaintiff was nearby. (Doc. 25-2 at 2). One contract employee named Shelnut called plaintiff a bitch while they were

working on a job at TVA's Southaven plant, and the manager of the plant heard him and removed Shelnut from the job.  (Doc. 21-6 at 41).

Plaintiff complained to Phillip Willis, who was her lead foreman when she began working in the roving maintenance organization, about the employees on her crews calling her derogatory names.  (Doc. 21-6 at 36).  Although plaintiff primarily complained to Willis, she stated she also complained to Wayne Wallace, a program manager for PSS's roving maintenance organization.  (*Id.* at 36, 22-24).  According to plaintiff, Willis and Wallace told her the employees "just have a problem with [her]" and "[d]on't like working for [her] maybe because [she's] female."  (*Id.* at 23).

Plaintiff testified that two contract employees, Darryl Cox and Clinton Peters, called her a bitch in a text message that was sent to her, and the text message also stated that "something has got to be done about her."  (*Id.* at 35, 85).  Plaintiff reported the text message to Bobby Terrell, a PSS senior manager, and to Wallace. (*Id.* at 35, 37).  After she reported the incident, Wallace told her that "Peters would not be allowed to work for Hydro Field Services again," and plaintiff never had to work with Peters after she reported the incident.  (*Id.* at 37-38).  Cox had been laid off before plaintiff complained about the text message, and there is nothing in the record to suggest plaintiff had to work with him again after this incident.  (*Id.* at 35).

Plaintiff also testified about an incident regarding graffiti at TVA's Magnolia plant. (Doc. 21-6 at 59).  Specifically, plaintiff testified Mike Jones, a TVA employee at Magnolia, told her about derogatory comments directed to an African-American female inside the portable toilet next to her work trailer.  (*Id*. at 59-60).  Plaintiff did not see the comments or know who wrote them, but she assumed they were directed at her because she was the only African-American female on the job.  (*Id.*).  Plaintiff also testified TVA removed the portable toilet from the job site and held a meeting with foremen and supervisors to say the derogatory comments would not be tolerated. (*Id.*).  Plaintiff did not complain to Terrell or anyone at Magnolia about the graffiti or how the incident was handled.  (*Id.* at 60).

Finally, plaintiff testified about an incident in which an employee posted a message on Facebook stating that she and Thompson were "going to get a ride [to] the morgue."  (Doc. 21-6 at 46-47).  Daisy Oakley, an employee in TVA's Equal Opportunity Office and plaintiff's friend, informed plaintiff of the message, and plaintiff did not see the message herself or know when the message was posted.  (*Id.* at 47).

2.      <u>Harassment by Wallace and Willis</u>

Plaintiff also claims Wallace and Willis, her supervisor and co-worker, undermined her authority during the time she worked for PSS's roving maintenance organization and that their actions contributed to her alleged hostile work environment.[4]  Plaintiff asserts Wallace and Willis undermined her authority by not allowing her to choose her own work crews.  According to plaintiff, Wallace and Willis selected all the workers for her crew while male foremen were allowed to choose their own crews.  (Doc. 25-1 at 6).  Plaintiff also states that Wallace and Willis "kept sending [the] same men who were harassing [her] back to [her] jobs even after [she] complained about them."  (*Id.* at 7).

When plaintiff worked as a regular foreman for PSS between 2008-2012, Willis was her lead foreman, and she reported directly to Willis.  (Doc. 21-6 at 10 & 19).  Even after plaintiff began working as a lead foreman in a dual-rate status, Wallace required her to continue reporting to Willis.  (*Id.* at 18-19 & 21).  Additionally, Wallace told plaintiff that Willis was "over" her, even though she and Willis held the same position.  (*Id.* at 21).  Plaintiff testified Wallace undermined her authority by

---

[4] Wallace was a program manager for PSS's roving maintenance organization.  (Doc. 21-1 at 4).  As a program manager, Wallace directed the day-to-day activities of roving maintenance employees.  (*Id.* at 4-5).  Thus, Wallace was plaintiff's supervisor when she worked as a foreman and lead foreman for PSS, but Wallace did not have authority to hire, fire, promote, transfer, or reassign her or other TVA employees.  (*Id.* at 5; Doc. 25-1 at 4).  Instead, Terrell had that authority.  (Doc. 21-6 at 12).

"constantly" requiring her to report to Willis when she was a lead foreman.  (*Id.* at 19-20).  At her deposition, plaintiff could remember only two specific instances when Wallace told her to report to Willis:  (1) on an unspecified date when she was working in the office and (2) during a meeting with Wallace and Willis in May 2013.  (*Id.* at 21).  Plaintiff also testified that Willis yelled at her  in front of her crew in February 2012, stating that she reported to him.  (Doc. 21-6 at 19-20; Doc. 25-1 at 6).

Plaintiff did not object to reporting to Willis when she was a regular foreman and he was her lead foreman, but she felt demeaned and humiliated when Wallace required her to continue reporting to Willis after she began working as a lead foreman in January 2012.  (*Id*. at 19, 22).  Plaintiff complained to Terrell about Wallace requiring her to report to Willis when she was a lead foreman, and Terrell told plaintiff she could report to him and Steve Cina, who was manager at PSS.  (*Id.* at 25).  Plaintiff testified that she saw no difference after she complained to Terrell about Wallace requiring her to report to Willis.  (*Id.*).

Plaintiff also asserts Wallace excluded her from meetings he held only with Willis.  (*Id.* at 26).  Plaintiff testified about only one specific meeting she was excluded from, which occurred in February 2013 at TVA's Magnolia plant.  (*Id.* at 26-27).  The meeting was to address issues with a job plaintiff completed at the plant.  Plaintiff testified that when she complained to Terrell about being excluded from the

meeting at Magnolia Plant, he told her she should be included in the meeting.  (*Id.* at 27).  Additionally, plaintiff admitted she was allowed to attend the February 2013 meeting after she complained to Terrell.  (*Id.*).  Plaintiff testified there were other meetings with Wallace and Willis that she was excluded from, though she could not recall when they occurred.  (*Id.*).  Plaintiff believed she was excluded from meetings because she was female and testified that male foremen went to all the meetings pertaining to their jobs.  (*Id.* at 28-29).

Plaintiff testified that along with excluding her from meetings, Wallace and Willis did not share job-related information with her, which made it necessary for her to go to other people to find information needed to complete her jobs.  (*Id.* at 31).  Plaintiff asserts Wallace and Willis did not share information with her about the names of contract employees who would work well with her on her crews.  (*Id.* at 32).  She testified there was other information they did not share with her, though she did not specify what type of information they kept from her.  (*Id.* at 32).  Plaintiff believes Wallace and Willis did not share job-related information with her because she is female, and she testified they would not withhold information from "other male counterparts."  (*Id.* at 32).

Wallace and Willis forcefully reprimanded plaintiff for seeking information from other people at TVA after they did not share job-related information with her.

She testified that Wallace reprimanded her during a meeting in early May 2013 when he yelled at her to "shut up" while banging his fist on his desk.  (*Id.* at 53, 83; Doc. 25-1 at 5).  Plaintiff felt threatened when Wallace yelled at her during that meeting. (Doc. 21-6 at 84).  According to plaintiff, Wallace also yelled at her over the phone when she tried to report problems with a contract employee.  (*Id.* at 57).

Finally, plaintiff claims Wallace counseled her under false pretenses in April 2012.  (*Id.* at 57-58).  Wallace questioned plaintiff about an anonymous complaint received by TVA's Office of Inspector General about her driving her TVA vehicle to Las Vegas.  (*Id.*; Doc. 21-14 at 1-2).  After questioning plaintiff, Wallace determined the complaint was unsubstantiated, and TVA did not discipline plaintiff. (Doc. 21-6 at 58; Doc. 21-14 at 2; Doc. 21-16 at 3).  Plaintiff does not know who made the complaint and did not hear anything further about the complaint after Wallace questioned her.  (Doc. 21-6 at 58).

## D.   Plaintiff's initial EEO complaint and complaints to her supervisors

After the May 2013 meeting with Wallace and Willis in which Wallace yelled at plaintiff while pounding his fist on his desk, plaintiff complained to Oakley in TVA's Equal Opportunity Office (EEO) on May 10 or 12, 2013.  (Doc. 21-6 at 76-77).  Plaintiff testified she filed her EEO complaint on May 14, 2013.  (*Id.*).

Oakley's EEO Counselor's Report reflects that plaintiff's initial contact with EEO was on May 14, 2013.  (Doc. 25-12 at 2).

On May 16, 2013, plaintiff also complained to Terrell after the May 2013 meeting with Wallace and Willis.  (Doc. 21-1 at 6; Doc. 21-6 at 54).  Plaintiff told him she "was considering" filing an EEO complaint.  (Doc. 21-6 at 54).  Terrell responded by saying he would "try to straighten things out with [Wallace and Willis]," but he also told her "[h]e [didn't] know how long he can keep [Wallace] from doing that." (*Id.*).  Plaintiff testified that after her meeting with Terrell, he told Wallace and Willis that she should be able to pick her own crews and that she was able to pick her own foreman for her next job at Magnolia plant.  (*Id.*).

In addition to Terrell, plaintiff also complained to Mark Bevis, her mentor, and Craig Barger, the Power Service Field Supervisor, about Wallace's and Willis' behavior at the May 2013 meeting.  (Doc. 21-6 at 77).  Plaintiff told both of them that she had filed an EEO complaint.  (*Id.*).

**E.    Plaintiff's clearance violation and demotion**

On May 17 or 18, 2013, plaintiff arrived at TVA's Magnolia plant to begin work as a lead foreman on a job, and she was very pleased with the crew she had for

the job.[5]  (Doc. 21-6 at 53, 67; Doc. 21-21 at 6).  A clearance violation occurred when work began at Magnolia on May 19, 2013.  (Doc. 21-21).  "Clearances isolate machines and equipment from their energy sources" before work is performed in order to prevent the equipment from "energizing, starting up, or releasing any stored energy" while maintenance work is performed on the equipment.  (Doc. 21-20 at 1-2).  Violating the proper clearance procedures can result in significant injury or death.  (Id.; Doc. 21-1 at 7).

Plaintiff served as the Permanent Authorized Employee (PAE) for the job at Magnolia, though she did so "unwillingly."  (Doc. 21-6 at 67).  As the PAE, she was responsible for "holding the clearance," which means she was responsible for ensuring the clearances were in place before any work was performed for the job.  (Id. at 65).  Accordingly, plaintiff was required to test for and verify the absence of energy in the equipment her crew would work on before they began the job.  (See Doc. 21-21 at 3).  Plaintiff had received training on the responsibilities of a PAE, but she had never been the PAE at Magnolia before.  (Doc. 21-6 at 65 & 68).

Once plaintiff's crew began working at Magnolia on May 19, 2013, they discovered a cooling system they were working on "was still energized because it was

_____

[5] McCalister has not presented any evidence that anyone at Magnolia knew of her EEO complaint.

pressurized with coolant." (Doc. 21-20 at 3). Work immediately stopped at the site after this clearance violation, and plaintiff was sent back to PSS in Muscle Shoals. (Doc. 21-6 at 71).

Following the clearance violation, TVA removed plaintiff's temporary foreman position on May 19, 2013 and returned her to her permanent job classification of electrician, which effectively demoted her from her temporary foreman position. (*Id.*; Doc. 21-12 at 2; Doc. 25-5 at 5; Doc. 25-8 at 4). Terrell stated that because plaintiff "could not hold a clearance pending investigation of the clearance violation, she was not able to serve as a foreman." (Doc. 21-1 at 7). After plaintiff returned to PSS following the clearance violation, she worked in the maintenance shop repairing equipment. (Doc. 21-6 at 72).

Terrell was out of the office on May 19, 2013, the day of the clearance violation, so Randy Weatherington, the PSS General Manager, made the decision to demote plaintiff. (Doc. 21-1 at 7; Doc. 25-5 at 5). Weatherington testified "[a]s far as taking [plaintiff] out of the temporary foreman position, when [the clearance violation] happened, I immediately . . . asked her supervisor to take her out of that temporary foreman role, that leadership role, until we got to the bottom of everything." (Doc. 25-5 at 5). Weatherington further testified that he thought Barger was the supervisor he talked to about the clearance violation. (*Id.*). Additionally,

Weatherington testified that he did not think Bevis was involved in the decision to demote plaintiff, but that Bevis worked with Terrell and Paulette Mullins "to actually make [the demotion] happen through HR." (*Id*. at 7). Bevis, however, testified he did not play a role in plaintiff's demotion. (*See* Doc. 25-6 at 3).

TVA investigated the clearance violation and issued a report about the violation, which analyzed the causes of the violation and also listed the corrective actions taken following the violation. (Doc. 21-21). Robb Girnus, a construction manager at PSS, led the team that investigated the clearance violation, and Barger was on the team. (Doc. 21-20 at 1; Doc. 21-21 at 17). Following the investigation, the team concluded "there was a breakdown in effective communication between the Responsible Employee [] and the [] PAE" and found that plaintiff's failure "to verify the absence of energy to the flame detector coolant system" was the root cause of the clearance violation. (Doc. 21-21 at 4).

## F.   **Plaintiff's formal EEO complaint**

After the clearance violation, plaintiff sought counseling from TVA's EEO office on May 22, 2013. (Doc. 21-24 at 1). Along with her earlier complaints regarding harassment and hostile work environment, plaintiff alleged she was discriminated against based on her race and gender when she received the clearance violation and was demoted from her temporary foreman position. (Doc. 21-25 at 2).

TVA's Office of Equal Opportunity Compliance (EOC) sent a memo dated June 19, 2013, to Wallace and Willis regarding plaintiff's allegations.  (*Id*. at 2-3).  Plaintiff, Terrell, Weatherington, and Paulette Mullins, who worked in human resources, were copied on the memo.  (*Id.*).  The June 19 memo was the first time the EOC office contacted anyone at PSS regarding plaintiff's allegations.  (Doc. 21-24 at 2).

Plaintiff filed a formal written EEO complaint on August 6, 2013.  (Doc. 21-26 at 1).  In her complaint, plaintiff claimed she was discriminated against and subjected to a hostile work environment based on her gender and race, and she further claimed TVA retaliated against her by demoting her from lead foreman to electrician on May 19, 2013.  (Id. at 3).  Additionally, in her complaint, plaintiff alleged "[w]hite males have been accused of the same or similar conduct and were either not demoted or were immediately reinstated to their former positions and pay after a short demotion."  (*Id.* at 4).  TVA's EEO office denied plaintiff's claims on May 5, 2014, and this action timely followed.  (Doc. 21-27).

## DISCUSSION

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  "The factual inquiry in

a Title VII case is whether the defendant intentionally discriminated against the plaintiff.  In other words, is the employer . . . treating some people less favorably than others because of their race, color, religion, sex, or national origin." *U.S. Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983) (internal citations and quotation marks omitted).  Plaintiff asserts claims against TVA under Title VII for gender discrimination, hostile work environment based on gender, and retaliation. (Doc. 1).  The court will address each of her claims in turn.

## A.   <u>Count One–Gender Discrimination</u>

In Count One, plaintiff alleges TVA discriminated against her based on her gender.  "Discrimination claims brought under Title VII . . . are typically categorized as either mixed-motive or single-motive claims." *Quigg v. Thomas County Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016) (footnote omitted).  A plaintiff "can succeed on a mixed-motive claim by showing that illegal bias, such as bias based on sex or gender, 'was a motivating factor for' an adverse employment action, 'even though other factors also motivated' the action. . . .  In contrast, single-motive claims-which are also called 'pretext' claims–require a showing that bias was the true reason for the

adverse action."[6]   *Id.* (citations omitted).   Here, plaintiff pled her gender discrimination claim as a single-motive claim.   (*See* Doc. 1 at ¶¶ 46-49, 55-60).

Whether an employer intentionally discriminated against an employee is a question of fact, which may be proved either through direct, circumstantial, or statistical evidence.  In the present case, plaintiff has not produced any direct or statistical evidence of discrimination; rather, she seeks to prove her case through circumstantial evidence.  (*See* Doc. 24 at 6-24, 27-29).

A plaintiff may prove a single-motive claim based on circumstantial evidence using the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and subsequent cases.  *See Quigg*, 814 F.3d at 1236-37.  Under this framework, the plaintiff must first establish a *prima facie* case

---

[6] Plaintiff pled her discrimination claim as a single-motive, or pretext, claim in her complaint, alleging  she is a member of a protected class, was demoted, the reason given for her demotion was pretext, and male employees accused of similar conduct were given preferential treatment.  (Doc. 1 at ¶¶ 46-49, 55-60).  TVA's motion for summary judgment treated plaintiff's discrimination claim as a single-motive claim.  (*See* Doc. 22).  However, in plaintiff's opposition to TVA's motion for summary judgment, she argues that she asserts a mixed-motive discrimination claim.  (Doc. 24 at 27-28).  The Eleventh Circuit has indicated that a plaintiff must plead a mixed-motive claim in her complaint, and in *Quigg* the Court noted that the appellant/plaintiff asserted mixed-motive sex discrimination claims in her complaint.  *Quigg*, 814 F.3d at 1234.  *See also Keaton v. Cobb County, Ga.*, 2009 WL 212097, at *10 (11th Cir. Jan. 30, 2009) (noting the plaintiff/appellant "did not raise the mixed motive issue in her original complaint, and her footnote [in her brief] was sufficient neither to provide appellees with adequate notice of the new claim nor to amend the original complaint") (citation omitted).  Moreover, "[a] plaintiff may not amend her complaint through argument in a brief opposing summary judgment."  *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314-15 (11th Cir. 2004) (citation omitted).  Therefore, the court will analyze plaintiff's discrimination claim using the single-motive standard.

of discrimination by presenting evidence (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) she was treated less favorably than a similarly-situated individual outside of her protected class. *Maynard v. Bd. of Regents of Div. of Fla. Dep't of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003) (citing *McDonnell Douglas*, 411 U.S. at 802). By establishing a *prima facie* case, the plaintiff creates a rebuttable presumption that her employer unlawfully discriminated against her. *See Aikens*, 460 U.S. at 714. The burden then shifts to the employer to rebut this presumption by producing a legitimate, non-discriminatory reason for the challenged employment action. *See McDonnell Douglas*, 411 U.S. at 802; *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981). Should the employer meet its burden of production, the presumption of discrimination is rebutted, and the inquiry "proceeds to a new level of specificity," in which the plaintiff must show that the proffered reason is pretext for unlawful discrimination. *See Burdine*, 450 U.S. at 255-56. Although the intermediate burdens of production shift back and forth, the ultimate burden of persuading the trier of fact that the employer intentionally discriminated against the employee remains at all times with the plaintiff. *See id.* at 253; *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).

Plaintiff alleges that TVA demoted her based on her gender in violation of Title VII and that similarly-situated male employees were treated more favorably because they were not disciplined as severely following a safety violation or were reinstated to their foreman positions and rates of pay after a violation. (Doc. 1 at ¶¶ 47-49, 55-61). TVA argues it is entitled to summary judgment on plaintiff's gender discrimination claim because she cannot show it treated male employees more favorably and because it had legitimate, nondiscriminatory reasons for its actions after her clearance violation.[7] (Doc. 22 at 28-29).

1.    Plaintiff's *prima facie* case

To establish a *prima facie* case of gender discrimination under a single-motive theory, plaintiff must show TVA treated similarly-situated male employees more favorably. *See McDonnell Douglas*, 411 U.S. at 802. In order to determine "whether employees are similarly situated for purposes of establishing a *prima facie* case, it is necessary to consider whether the employees are involved in or accused of the same

---

[7] TVA did not offer any arguments regarding the first three elements of plaintiff's *prima facie* case of gender discrimination. (*See* Doc. 22). The court notes evidence in the record shows plaintiff is a member of a protected class, was qualified for her foreman position, and suffered an adverse employment action when she was demoted following her clearance violation. Evidence in the record also indicates that preventing plaintiff from working as a foreman in a temporary role after her clearance violation would be an adverse employment action because temporary foremen, whether working in a temporary position for a certain term or in a dual-rate status, earn more than electricians. *See Gillis v. Georgia Dep't of Corrections*, 400 F.3d 883, 887 (11th Cir. 2005) ("[A]ctions that affect compensation are considered adverse employment actions.") (citing *Gupta v. Florida Bd. of Regents*, 212 F.3d 571 (11th Cir. 2002)).

or similar conduct and are disciplined in different ways." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir.1997).

Plaintiff identifies five male comparators who were treated more favorably by TVA because they did not lose their foreman position, or were allowed to return to their foreman work and rate of pay, after a safety violation: Josh Holcombe, Phillip Willis, DeWayne Holloway, Jody Cypert, and Jerry Reaves. (Doc. 21-28 at 7-8; Doc. 24 at 19-20; Doc. 25-1 at 14-15). TVA argues these five male employees are not valid comparators because they either are not similarly-situated employees, or were not treated more favorably than plaintiff. (*See* Doc. 22 at 20-21, 28-29).

First, plaintiff alleges TVA treated Josh Holcombe more favorably because he was not demoted following a clearance violation, while TVA asserts Holcombe is not a similarly-situated employee because he did not have a clearance violation. (*See* Doc. 21-28 at 8; Doc. 22 at 21; Doc. 21-29 at 1). Donald Williams, Holcombe's supervisor, stated that an employee at TVA's Watts Bar nuclear plant "questioned whether [ ] Holcombe had violated clearance procedures," but Williams determined no clearance violation had occurred. (Doc. 21-29 at 1-2). Plaintiff did not address Williams' statement in her opposition to TVA's motion, and she previously testified that she learned of Holcombe's clearance violation "[f]rom information that was passed on just from information on the job," but she does not remember who told her

the information.  (Doc. 25-1 at 15; Doc. 21-6 at 75).  Plaintiff's allegation that Holcombe had a clearance violation, which is based on hearsay, is not enough to raise a question of fact regarding the issue.  *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293 (11th Cir. 2012) ("'The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment.'") (quotation omitted).  Therefore, plaintiff did not show Holcombe is a similarly-situated employee for purposes of her gender discrimination claim.

Second, plaintiff alleges TVA treated Phillip Willis more favorably because he was not removed from his foreman position after he "signed off on an incorrect work package."  (Doc. 21-28 at 8; Doc. 25-1 at 15).  On the other hand, TVA argues plaintiff has not shown Willis is a similarly-situated employee because she did not present any evidence to suggest signing off on an incorrect work package is similar to a clearance violation.  (Doc. 26 at 11, n.5).  Indeed, there is no evidence that signing off on an incorrect work package is similar to a clearance violation; rather, plaintiff stated Willis' violation "posed a clearance and environmental risk."  (Doc. 25-1 at 15).  Thus, her allegation regarding Willis' violation does not raise a question of material fact regarding whether he is similarly situated to her with respect to her clearance violation.  *See Wilson v. B/E Aerospace*, 376 F.3d 1079, 1091 (11th Cir.

2004) ("The plaintiff and the employee she identifies as a comparator must be similarly situated 'in all relevant respects.'") (citation omitted).

Next, plaintiff alleges DeWayne Holloway and Jody Cypert, two male employees in PSS's transformer services group, received more favorable treatment because they were not permanently demoted from their foreman positions after a clearance violation. (*See* Doc. 21-28 at 7; Doc. 25-1 at 14-15).  The Rule 56 record shows Holloway and Cypert were both involved in a clearance violation in November 2011.  (Doc. 21-1 at 8).  TVA argues the two men were not treated more favorably than plaintiff because Holloway and Cypert both lost their foreman positions immediately following their clearance violation and neither was promoted to a temporary foreman position after their violation.[8] (*See id.*).  Plaintiff does not dispute this evidence; therefore, she has not shown Holloway and Cypert were treated more favorably than her with respect to her demotion immediately after her clearance violation.  (Doc. 24 at 19, 29-30; Doc. 25-1 at 14-15).

Plaintiff also asserts Holloway and Cypert were treated more favorably because they were allowed to return to foreman work at a foreman rate of pay following their

---

[8] Holloway worked in a temporary foreman position similar to plaintiff's temporary position, and Cypert worked as a foreman in a dual-rate status.  Holloway was demoted from his temporary foreman position immediately following the clearance violation, and Cypert lost his dual-rate status. (Doc. 21-1 at 8).

clearance violation.  (Doc. 24 at 19, 29-30; Doc. 25-1 at 14-15).  Indeed, although neither Holloway nor Cypert was promoted to a temporary foreman position after their clearance violation, both men returned to work as foremen in a dual-rate status for at least a few hours or days at a time beginning approximately two months after their clearance violation.  (Doc. 21-1 at 8).  Plaintiff, however, has not worked as a foreman in a dual-rate status since her clearance violation in May 2013.  Instead, plaintiff worked as an electrician in the maintenance shop for approximately four months until she requested and was granted a transfer to work as an electrician in PSS's transformer services group in September 2013.[9]  (Doc. 21-6 at 72; Doc. 21-30 at 1-2).  Because undisputed evidence shows Holloway and Cypert both worked as foremen in a dual-rate status beginning approximately two months after their clearance violation, while plaintiff did not, there is a question of fact regarding whether TVA treated them more favorably than plaintiff.

Finally, plaintiff alleges TVA treated Jerry Reaves, a male employee in PSS's coal field services group, more favorably because he returned to a foreman position following a "near miss" incident in October 2013.  (Doc. 21-28 at 8; Doc. 25-1 at 15).  For its part, TVA argues it did not treat Reaves more favorably than plaintiff after his

---

[9] Plaintiff testified that she requested the transfer "for the overtime to make up for [her] money loss."  (Doc. 21-6 at 72).

safety violation because Reaves lost his temporary foreman position immediately after the "near miss" incident and did not regain that position.  (Doc. 22 at 29).  Once again, plaintiff did not dispute this evidence, and she has not shown TVA treated Reaves more favorably with respect to her demotion immediately after her clearance violation.  (Doc. 24 at 20).

Plaintiff also argues Reaves was treated more favorably because he was allowed to return to foreman work at a foreman rate of pay after his violation.  (Doc. 24 at 19, 29-30; Doc. 25-1 at 15).  Even though Reaves was not promoted back to a temporary foreman position before his retirement in 2015, the record establishes he worked as a foreman in a dual-rate status after his "near miss" incident.  (Doc. 21-1 at 9).  TVA did not produce any evidence regarding when Reaves began working as a foreman in a dual-rate status after the incident, but Thompson remembers Reaves "going back to [f]oreman status right after [the 'near miss' incident] happened." (Doc. 25-2 at 6).  Because there is evidence Reaves worked as a foreman in a dual-rate status "right after" his safety violation, there is a question of fact regarding whether TVA treated Reaves more favorably than plaintiff after her violation.

Based on the foregoing, there is no question of material fact regarding whether TVA treated similarly-situated male employees more favorably than plaintiff with respect to her demotion from her temporary foreman position immediately after her

clearance violation.  Thus, to the extent plaintiff's discrimination claim is based on her demotion from her temporary foreman position immediately after her clearance violation, plaintiff cannot state a *prima facie* case of gender discrimination.  As a result, TVA is entitled to summary judgment in its favor as to plaintiff's claim that TVA discriminated against her by demoting her from her temporary foreman position immediately after her clearance violation.

To the extent plaintiff's discrimination claim is based on her allegations that TVA allowed similarly-situated male employees to return to a foreman status and wage rate after safety violations, the record shows there is a question of fact regarding whether TVA treated similarly-situated male employees more favorably than plaintiff by allowing the male employees to work as foreman in a dual-rate status following their safety violations.  Indeed, TVA admits in its reply brief that "[a]s to [plaintiff's] non-assignment to additional temporary foreman roles, male employees were assigned such roles following clearance violations."  (Doc. 26 at 11).  Thus, to the extent plaintiff's gender discrimination claim is based on TVA's failure to assign her work as a foreman in a dual-rate status after her clearance violation, the court finds

that plaintiff has set out sufficient genuine disputed facts such that her burden to establish all elements of her *prima facie* case have been met.[10]

2.    TVA's proffered reasons for its actions and pretext

TVA argues that even if plaintiff states a *prima facie* case of gender discrimination, it is still entitled to summary judgment on her claim because it had legitimate, non-discriminatory reasons for its actions after plaintiff's clearance violation and there is no evidence of pretext.  (Doc. 22 at 29-30).

TVA asserts it had the following legitimate, non-discriminatory reasons for not providing plaintiff with additional foreman assignments following her clearance violation and demotion: (1) PSS's roving maintenance organization did not have any employee in a temporary (non-dual rate) foreman position between May 2013, when plaintiff was demoted, and October 2015; and (2) plaintiff lacks significant transformer experience, and PSS's transformer services group already has a

---

[10] TVA characterizes plaintiff's allegations about not being reinstated as a temporary foreman or given other foreman roles after her clearance violation as a failure-to-hire claim, and TVA argues the claim must fail because there is no evidence plaintiff applied for any temporary foreman positions after her clearance violation.  (Doc. 22 at 30).  However, the allegations in plaintiff's complaint do not suggest she is asserting a separate failure-to-hire claim.  (See Doc. 1).  Rather, her arguments and allegations about returning to a foreman role after her clearance violation relate to her allegations that TVA treated similarly-situated men more favorably by not disciplining them as harshly and by allowing them to return to work as foreman following a safety violation.  (*See id.* at ¶¶ 59-60).  Moreover, TVA's own evidence establishes that no formal paperwork, such as an application, is required for an employee to work in a dual-rate status as a foreman, and there is no evidence to suggest Holloway, Cypert, or Reaves submitted applications to work as foreman in a dual-rate status following their violations.  (Doc. 21-1 at 4).  Accordingly, the court need not and does not address TVA's argument regarding plaintiff's purported failure-to-hire claim.

permanent foreman and more experienced employees serving as foremen in a dual-rate status.  (Doc. 21-6 at 72 & 74; Doc. 21-30 at 1-2; Doc. 22 at 30).

Based on the evidence produced by TVA, the court finds TVA has shown a legitimate, non-discriminatory reason for not promoting plaintiff back to a temporary foreman position following her clearance violation because the roving maintenance organization did not have any employee serving in that position between May 19, 2013, when plaintiff was demoted, and October 2015, which is long after plaintiff transferred to PSS's transformer services group in September 2013.[11]  In addition, TVA has shown a legitimate, non-discriminatory reason for not allowing plaintiff to work as a foreman in a dual-rate status after her transfer to the transformer services group in September 2013 because she is less qualified than other employees in the group.

Plaintiff has not produced any evidence that TVA's proffered reasons for its decisions to not promote plaintiff back to a temporary foreman position in the roving maintenance organization or give her work as a foreman in a dual-rate status for the transformer services group are false.  Instead, plaintiff argues that "inconsistencies

---

[11] The court notes the evidence shows that Holloway, Cypert, and Reaves were not promoted to a temporary foreman position following their safety violations even though they did work as foreman in a dual-rate status after their violations. *See*, pp. 25-27, *supra*.  Thus, there is no evidence TVA treated similarly-situated male employees more favorably than plaintiff with respect to not promoting her back to a temporary foreman position after her clearance violation.

throughout the EEO investigation constitute unlawful pretext." (Doc. 24 at 30).  The

alleged inconsistences, however, have no bearing on the reasons TVA proffered for

not giving plaintiff work as a temporary foreman after her clearance violation.  As a

result, plaintiff has not shown there is a question of material fact regarding whether

TVA's reasons for not promoting her to another temporary foreman position and not

allowing her to work as a foreman in a dual-rate status for the transformer services

group were pretext for discrimination.  *See Brooks v. County Comm'n of Jefferson*

*County, Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) ("A reason is not pretext for

discrimination 'unless it is shown both that the reason was false, and that

discrimination was the real reason.'") (quoting *St. Mary's Honor Ctr. v. Hicks*, 509

U.S. 502, 515 (1993)).   Therefore, TVA is entitled to summary judgment on

plaintiff's discrimination claim to the extent the claim is based on TVA's failure to

promote plaintiff to another temporary foreman position after her clearance violation

and its failure to provide her with work as a foreman in a dual-rate status after her

transfer to the transformer services group.

This does not end the analysis of TVA's arguments for summary judgment,

however, because TVA did not offer any reason to explain why plaintiff did not work

as a foreman in a dual-rate status for the roving maintenance organization during the

four months between her clearance violation and her transfer to the transformer

services group.  (*See* Doc. 22).  Although PSS's roving maintenance organization did not have any employees in a temporary foreman position during the relevant time, there is nothing in the record to suggest that it did not have any employees working as foreman in a dual-rate status in the four months between plaintiff's clearance violation and her transfer.  Additionally, there is no evidence that plaintiff is less qualified than employees who may have worked in a dual-rate status for roving maintenance after her clearance violation.  Finally, as to TVA's assertion that plaintiff could not serve in a foreman role pending its investigation of her clearance violation, TVA did not cite any evidence regarding when it completed its investigation, or any evidence suggesting the results of its investigation precluded plaintiff from serving as a foreman in a dual-rate status.

TVA did not articulate any reason for not giving plaintiff work as a foreman in a dual-rate status in PSS's roving maintenance organization after her clearance violation and before her transfer to the transformer services group.  Therefore, TVA did not meet its burden of producing a legitimate, non-discriminatory reason for this action.  As a result, TVA has not rebutted the presumption that it unlawfully discriminated against plaintiff by not giving her work as a foreman in a dual-rate status for the roving maintenance organization after her clearance violation. Therefore, TVA has not met its burden of showing it is entitled to summary judgment

on plaintiff's gender discrimination claim to the extent the claim is based on its failure to provide plaintiff with work as a foreman in a dual-rate status in the roving maintenance organization after her clearance violation.

3.   Conclusion

As discussed above, plaintiff has met her burden of producing sufficient evidence to state a *prima facie* case of gender discrimination to the extent her claim is based on allegations TVA treated similarly-situated male employees more favorably by allowing them to work as foreman in a dual-rate status after a clearance violation. TVA did not articulate any legitimate, non-discriminatory reason for not allowing plaintiff to work as a foreman in a dual-rate status for the roving maintenance organization after her May 2013 clearance violation and before her September 2013 transfer to the transformer services group. As a result, TVA's motion for summary judgment is due to be denied as to plaintiff's gender discrimination claim to the extent the claim is based on TVA's failure to give plaintiff work as a foreman in a dual-rate status in the roving maintenance organization after her clearance violation.

However, TVA's motion for summary judgment is due to be granted as to plaintiff's gender discrimination claim to the extent the claim is based on (1) plaintiff's demotion immediately after her clearance violation, (2) TVA's failure

to give plaintiff another temporary foreman position after her clearance violation, and (3) TVA's failure to give plaintiff work as a foreman in a dual-rate status after her transfer to the transformer services group.

## B.    Count Two–Hostile Work Environment

In Count Two, plaintiff alleges she was forced to work in a hostile work environment based on her gender.  "Title VII protects an employee from having to endure a hostile work environment that is the product of unlawful harassment." *Swindle v. Jefferson County Comm'n*, 593 Fed.Appx. 919 (11th Cir. 2014) (citations omitted).  To establish a hostile work environment claim against an employer, a plaintiff must show her "workplace [was] permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment."  *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (quoting *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993)).  To do so, the plaintiff must present evidence:  (1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her gender; (4) the harassment was severe or pervasive enough to alter the terms and conditions of her employment and create a discriminatorily abusive working environment; and (5) the employer is responsible for the environment under a theory of either direct or

vicarious liability.  *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1248-49 (11th Cir. 2014); *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1300 (11th Cir. 2010).

In this matter, there is no dispute that plaintiff is a member of a protected class and was subjected to unwelcome harassment.  (*See* Doc. 22 at 23).  Thus, only the last three elements of plaintiff's hostile work environment claim are at issue.  The court will address disputed elements of plaintiff's claim after first addressing TVA's argument that some of the incidents of alleged harassment cannot be considered because they were not timely reported to its EEO office.

### 1.     The timeliness of plaintiff's hostile work environment claim

Under Title VII, a plaintiff must bring and exhaust an administrative claim prior to filing suit in federal court.  *See Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1317 (11th Cir. 2001).  To bring a timely administrative claim in this case, plaintiff had to initiate contact with an EEO counselor within 45 days of the unlawful discriminatory acts.  29 C.F.R. § 1614.105(a)(1).

"A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'"  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (42 U.S.C. § 2000e-5(e)(1)).  Thus, under Title VII, a plaintiff's hostile work environment claim is timely if at least one of the acts contributing to the unlawful employment practice was timely reported.  *Id.*  In

determining if a hostile work environment claim is timely, "[a] court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period." *Id.* at 120.

TVA argues that three of the incidents plaintiff complains of cannot be considered by the court because they were not timely reported and are not related to the other acts comprising her hostile work environment claim. (Doc. 22 at 22). Those three incidents are: (1) TVA prevented plaintiff from performing post-job inspection and maintenance in early 2012, (2) the false accusation to TVA's OIG office regarding plaintiff's use of her TVA vehicle in April 2012, (3) and the graffiti on the portable toilet in March 2013. (*Id.*).

The court finds the acts involving post-job inspection and maintenance and the false accusation to TVA's OIG office regarding plaintiff's use of her TVA work vehicle occurred more than 45 days before plaintiff sought counseling from TVA's EEO office, and they are not sufficiently related to the other acts comprising plaintiff's hostile work environment claim to be part of the same unlawful work practice. First, the incident regarding post-job inspection and maintenance involved

different actors than the other acts plaintiff complains of, and it only occurred once.[12] Next, the false accusation to TVA's OIG office regarding plaintiff's TVA vehicle was anonymous, occurred only once, and is different from the other types of behavior plaintiff complains of, which all involve Willis or Wallace undermining plaintiff's authority, or employees calling her derogatory names. As a result, the court will not consider the false accusation to the OIG office or the post-job inspection and maintenance claim when deciding plaintiff's hostile work environment claim.

The same is not true, however, for plaintiff's complaint regarding the graffiti on a portable toilet near her office at Magnolia. Although there is no evidence regarding who was responsible for the derogatory statements written in the portable toilet next to plaintiff's work trailer, the graffiti incident is similar to the incidents in which contract employees called plaintiff derogatory names via a text message or within hearing distance of her. Thus, the court finds the incident regarding graffiti at Magnolia is sufficiently related to the other acts comprising plaintiff's hostile work environment claim to be considered as part of her claim.

---

[12] Plaintiff also does not mention her allegation regarding post-job inspection and maintenance in her response to TVA's motion for summary judgment. (*See* Doc. 24). Thus, she has abandoned any claim she had based on this allegation. *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995), *cert. denied*, 516 U.S. 817 (1995) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").

2.    <u>Harassment based on gender</u>

It is a "bedrock principle [in the Eleventh Circuit] that not all objectionable conduct or language amounts to discrimination under Title VII." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1297 (11th Cir. 2012) (citation and internal quotation marks omitted).  Indeed, "Title VII does not prohibit . . . harassment alone, however severe and pervasive.  Instead, Title VII prohibits discrimination, including harassment that discriminates based on a protected category such as sex." *Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287, 1301-02 (11th Cir. 2007).  *See also Jones*, 683 F.3d at 1297 ("[O]nly conduct that is 'based on' a protected category, such as [gender], may be considered in a hostile work environment analysis.") (citation omitted).  Therefore, "'innocuous statements or conduct, or boorish ones' unrelated to a protected ground are not counted" in a hostile work environment claim. *Byrd v. Postmaster Gen*. 582 Fed.Appx. 787, 790 (11th Cir. 2014) (quoting *Gupta*, 212 F.3d at 583-84).  The context of the conduct is essential to determining if otherwise neutral conduct was based on a protected characteristic.  *See Jones*, 683 F.3d at 1297 ("This 'inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target.'") (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)); *Reeves v. C.H. Robinson*

*Worldwide, Inc.*, 594 F.3d 798, 810 (11th Cir. 2010) (*en banc*) ("[T]he context of offending words or conduct is essential to the Title VII analysis.").

TVA argues plaintiff's hostile work environment claim must fail because most of the conduct she complains of was not based on her gender.[13]  (Doc. 22 at 24).  As an initial matter, the Facebook message in which a contract employee stated plaintiff and Thompson should get a ride to a morgue is facially gender neutral and was directed to a male employee along with plaintiff.  (*See* Doc. 21-6 at 46-47).  Additionally, plaintiff does not know the actual content of the message and did not present any evidence that the message was based on her gender.[14]  (*See id.*).  Therefore, the message will not be considered as part of plaintiff's hostile work environment claim.

Much of the other harassing conduct plaintiff complains of is facially gender neutral and was perpetrated by Wallace and Willis, including:  (1) ordering plaintiff to report to Willis (2) excluding plaintiff from meetings; (3) not sharing pertinent

---

[13] TVA cannot and does not dispute that the incidents in which contract employees called McCalister a "bitch" and other gender-based derogatory comments were related to her gender.  (*See* Doc. 22 at 24).  *See also Reeves*, 594 F.3d at 810 ("Calling a female colleague a 'bitch' is firmly rooted in gender.  It is humiliating and degrading based on sex.") (citation omitted).  In addition, TVA does not dispute that the incident involving graffiti directed towards an African-American female was related to gender.  (*See* Doc. 22 at 24).

[14] Although the message may have been based on plaintiff and Thompson's race, plaintiff did not assert a claim for hostile work environment based on race.

information with plaintiff; (4) reprimanding plaintiff in front of others, yelling at plaintiff, and undermining her authority with members of her crews; and (5) not allowing plaintiff to choose workers for her crews and assigning men to work on her crews even after she complained about them.  (Doc. 24 at 8-10, 13-14).  Although this conduct is gender neutral, the court must look to the circumstances and context in which the conduct occurred when deciding if a reasonable jury could find the conduct was based on plaintiff's gender.  *See Jones*, 683 F.3d at 1297; *Reeves*, 594 F.3d at 810.

Plaintiff asserts that when she complained to Wallace and Willis about how members of her crews treated her, they told her the crew members "[d]on't like working for [her] maybe because [she is] female."  (Doc. 21-6 at 23; Doc. 24 at 14).  Construed in the light most favorable to plaintiff, a reasonable jury could find that Wallace and Willis' comment raises a question of fact regarding whether they were motivated by animus or hostility towards women in the workplace.  Thus, the court finds that at this stage in the litigation, plaintiff has raised a question of fact regarding whether Wallace's and Willis' conduct towards her was based on gender.

3.   Severe or pervasive harassment

TVA argues it is entitled to summary judgment because the alleged harassment was not severe or pervasive.  Federal employment laws are not a "general civility

code," and only harassment severe or pervasive enough to alter the terms of employment will create an actionable hostile work environment. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 789 (1998) (citing *Harris*, 510 U.S. at 80). "'The determination of whether [gender]-based harassment was so severe or pervasive as to alter the conditions of employment includes both subjective and objective components.'" *Jones*, 683 F.3d at 1299 (quoting *EEOC v. Xerxes Corp.*, 639 F.3d 658, 676 (4th Cir. 2011)). TVA did not offer any arguments regarding whether plaintiff subjectively felt the harassment was sufficiently severe and pervasive to create a hostile work environment; accordingly, only the objective component of this element of plaintiff's claim is at issue. (*See* Doc. 22 at 24-26).

The evaluation of this objective component is fact intensive, and "the Supreme Court and [Eleventh Circuit] have identified the following four factors that should be considered in determining whether harassment objectively altered an employee's terms or conditions of employment: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (citing *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997), citing in turn *Harris*, 510 U.S. at 23). No single one of the four *Harris* factors is

dispositive. *Miller*, 277 F.3d at 1276. Additionally, "courts should examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment." *Mendoza*, 195 F.3d at 1246 (citations omitted).

Beginning with the fourth *Harris* factor, plaintiff did not show the harassing conduct unreasonably interfered with her job performance. Instead, plaintiff testified that she always found the information necessary to do her job and completed all her jobs on time and under budget. (Doc. 21-6 at 17). Additionally, she received good performance reviews from TVA. (*Id.*). However, "[t]he Supreme Court has cautioned that harassment need not be shown to be so extreme that it produces tangible effects on job performance in order to be actionable." *Miller*, 277 F.3d at 1277 (citing *Harris*, 510 U.S. at 22).

Next, plaintiff testified about only two incidents that could potentially be considered physically threatening by a reasonable factfinder: (1) a text message sent to plaintiff by a contract employee in which the employee called plaintiff a "bitch" and said something has to be done about her; and (2) the May 2013 meeting in which Wallace cornered plaintiff in an office and yelled at her to "shut up" while pounding his fist on his desk. (Doc. 21-6 at 35-37, 46-47, 84-85). However, harassing conduct

does not have to be physically threatening in order to be actionable. *See Reeves*, 594 F.3d 798 (concluding a jury could find the appellant was subjected to a hostile work environment without discussing if the harassment she experienced was physically threatening and reversing the district court's order granting summary judgment for the employer).

Turning to the frequency and severity of the harassing conduct, plaintiff produced evidence of nine specific instances of alleged harassment:  Wallace ordered her to report to Willis on three occasions; plaintiff was excluded from one meeting pertaining to her work; Wallace and Willis yelled at her or reprimanded her in a demeaning manner on three occasions; someone wrote derogatory comments directed towards a black woman on a portable toilet next to plaintiff's work trailer; and plaintiff received a text message from a contract employee calling her a "bitch" and stating that "something has got to be done about her."  (Doc. 21-6 at 19-21, 26-29, 35-37, 46-47, 53-55, 59-60, 85).   Although those nine incidents may not be considered frequent or severe, plaintiff also testified that she "constantly" heard employees on her crews refer to her in gender-derogatory terms, such as "bitch" and "cunt," and plaintiff further stated "[t]he insults went on pretty much every day for years." (Doc. 21-6 at 36; Doc. 25-1 at 7).  Plaintiff could only name three specific contract employees who called her derogatory names, but she also testified she heard

other employees referring to her in derogatory terms outside of her work trailer and could not see who was speaking.  (Doc. 21-6 at 36).

TVA acknowledged plaintiff's testimony that she constantly overheard employees call her gender-specific derogatory names, but it did not directly address that testimony in its brief in support of its motion for summary judgment.  (*See* Doc. 22 at 12-13, 25).  Rather, TVA focused only on the two incidents in which a contract employee called plaintiff a "bitch" to her face or in a text message.  (*Id.* at 25).  TVA did not cite any authority suggesting gender-specific insults are only actionable if they are communicated directly to a plaintiff, and the Eleventh Circuit has recognized that "words and conduct that are sufficiently gender-specific and either severe or pervasive may state a claim of a hostile work environment, even if the words are not directed specifically at the plaintiff."  *Reeves*, 594 F.3d at 811.  Thus, plaintiff's testimony that she overheard employees refer to her as a "bitch" and "cunt" can support her hostile work environment claim.

The derogatory terms employees called plaintiff are demeaning and humiliating to women, and plaintiff introduced evidence that she heard them "constantly" and "pretty much every day" for years.  Viewing this evidence in the light most favorable to plaintiff, as required at this stage in the litigation, plaintiff has raised a question of material fact regarding whether the harassment she experienced while working in

TVA's roving maintenance organization was severe or pervasive enough to alter the terms of her working conditions.  *See Reeves*, 594 F.3d at 812-13 (finding evidence that coworkers made gender-specific derogatory comments about women on a daily basis was sufficient to raise a question of material fact regarding plaintiff's hostile work environment claim and reversing the district court's order granting summary judgment in favor of the employer).  *See also Adams*, 754 F.3d at 1253-54, 1259 (evidence that plaintiff "saw one coworker wear a shirt with a Confederate flag[, ] regularly saw racist graffiti in the men's restroom," and saw his supervisor carve a racial slur into part of a ship was sufficient to raise a question of fact regarding whether the harassment was frequent and severe and vacating the district court's order granting summary judgment in favor of the employer).

  4. <u>A basis to hold TVA liable for the hostile work environment</u>

   TVA argues that even if plaintiff can establish she was subject to severe or pervasive harassment based on her gender, it is still entitled to summary judgment because it is not liable for the harassment as a matter of law.  (Doc. 22 at 26-27).  The standard for holding an employer liable for hostile work environment depends upon "whether the harassment was perpetrated by a coworker or supervisor."  *Terrell v. Paulding Co.*, 539 Fed.Appx. 929, 932 (11th Cir. 2013) (citing *Torres-Negron v. Merck & Co.*, 488 F.3d 34, 40 (1st Cir. 2007)).

An employer may be vicariously liable for a hostile work environment created by a supervisor. *Vance v. Ball State Univ.*, __ U.S. __, 133 S.Ct. 2434, 2441 (2013). To be considered a supervisor for purposes of vicarious liability under Title VII, an employee must be "empowered by the employer to take tangible employment actions against the victim," "such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 2442, 2454. Here, there is no evidence that Wallace, Willis, or the employees who harassed plaintiff had the power to take a tangible employment action against her. Instead, there is undisputed evidence that Wallace did not have authority to take any tangible employment against plaintiff. (Doc. 21-1 at 5). Thus, none of the employees responsible for the alleged harassment was a supervisor for purposes of vicarious liability under Title VII, and the harassment at issue in this case was perpetrated by plaintiff's coworkers.

When the harassing employee is a coworker, "an employer is directly liable for [the] employee's unlawful harassment if the employer was negligent with respect to the offensive behavior." *Vance*, 133 S.Ct. at 2441 (citing *Faragher*, 524 U.S. at 789). Stated differently, an employer is liable for a coworker's harassment of another employee when the employer "'knew or should have known of the harassing conduct and failed to take prompt remedial action.'" *Baldwin v. Blue Cross/Blue Shield of*

*Alabama*, 480 F.3d 1287, 1302 (11th Cir. 2007) (quoting *Miller*, 277 F.3d at 1278).

"Thus, a victim of coworker harassment must show either actual knowledge on the part of the employer or conduct sufficiently severe and pervasive as to constitute constructive knowledge to the employer." *Miller*, 277 F.3d at 1278 (citing *Breda v. Wolf Camera & Video*, 222 F.3d 886, 889 (11th Cir. 2000)).  "When an employer has a clear and published policy that outlines the procedures an employee must follow to report suspected harassment and the complaining employee follows those procedures, actual notice is established." *Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1259 (11th Cir. 2003).

TVA maintains a printed code of conduct for employees that includes procedures employees should follow to report harassment.  (Doc. 21-11 at 2; Doc. 21-13 at 27).  The code of conduct states in pertinent part as follows:

> Harassment is prohibited and will not be tolerated.  Harassment includes verbal, nonverbal, or physical conduct that shows dislike or hostility because of race, color, religion, national origin, gender identity, age, sex, sexual orientation, or disability . . . .

> Employees who believe they are being harassed or have been harassed . . . should immediately report the incident to any of the following:

> - Their immediate supervisor or next level of management;
> - Their Human Resources representative;
> - TVA's EOC Staff; or
> - The OIG Empowerline.

> This procedure does not require an employee to report perceived harassment to a supervisor or to an individual whom the employee believes to be the harasser.

(Doc. 21-13 at 27).

TVA admits that plaintiff complained to Willis about employees on her crews calling her derogatory names, and Willis was plaintiff's lead foreman when she worked as a foreman.[15]  (Doc. 22 at 7 & 13).  TVA did not present any evidence regarding whether Willis was acting as plaintiff's lead foreman when she complained to him.  Thus, there is a question of fact regarding whether plaintiff reported the alleged harassment by the employees on her crews to her immediate supervisor in accordance with TVA's published procedures for reporting harassment.  As a result, there is a question of fact regarding whether TVA had actual knowledge of the harassing behavior.  TVA did not present any evidence regarding how Willis responded to plaintiff's complaints, while plaintiff alleges Willis and Wallace responded to her complaints by stating the employees "[d]on't like working for [her] maybe because [she is] female."  (Doc. 21-6 at 23).  Plaintiff also asserts Willis and Wallace kept assigning the same employees to her crews even after she complained

---

[15] TVA asserts there is no evidence plaintiff reported her complaints "as anything other than general workplace grievances . . . ."  (Doc. 22 at 27).  However, plaintiff's testimony that she "complained to [Willis] all the time" about being called gender-specific derogatory names gives rise to a reasonable inference that she reported to Willis that she was being harassed.

about the employees.  (Doc. 25-1 at 7).  Therefore, plaintiff has introduced sufficient evidence to create a question of fact regarding whether TVA took prompt remedial action after she reported that employees on her crews were calling her gender-specific derogatory terms, and TVA has not shown it cannot be liable for this harassment as a matter of law.

The same is not true for the other incidents of which plaintiff complains. Plaintiff admits TVA took action after she complained about the text message in which a contract employee called her a bitch, and she does not argue that the action taken was inappropriate.  (Doc. 21-6 at 35).  Plaintiff also admits that after graffiti containing derogatory comments directed to an African-American female was discovered on a portable toilet next to her office, TVA removed the portable toilet and held a meeting at the job site to say the derogatory comments would not be tolerated.  (*Id.* at 59-60).  Plaintiff did not complain about how TVA handled the incident, and her assertions that she does not remember an investigation into the incident or any disciplinary action taken in response to the incident are not enough to raise a question of fact regarding whether TVA took prompt remedial action.  (*See id.*; Doc. 25-1 at 7).  Because TVA took prompt remedial action, there is no basis to hold TVA liable for the incidents involving the text message and the graffiti on the portable toilet.

Next, the record shows that when plaintiff complained about Wallace's and Willis' alleged harassing behavior, TVA took action on her complaints.  First, when plaintiff complained to Terrell about being required to report job-related information through Willis, he told her she could report to him or Cina.  (Doc. 21-6 at 25). Second, when plaintiff complained to Terrell about being excluded from a meeting, she was allowed to attend the meeting.  (*Id.* at 27).   Finally, when plaintiff complained to Terrell about her May 2013 meeting with Wallace and Willis, Terrell responded by saying "[h]e would try to correct it . . . ."  (*Id.* at 54).  There is no evidence in the record that Wallace yelled at plaintiff again after her meeting with Terrell.  Moreover, after plaintiff complained to Terrell in May 2013, he told Wallace and Willis that she should be able to pick her own crew, and plaintiff was able to pick her own foreman for the May 2013 job at Magnolia.  (*Id.*).  "[I]t is not the court's role to second-guess the wisdom of [Terrell's] decisions" regarding how to handle plaintiff's complaints, *Alexander v. Fulton County*, 207 F.3d 1303, 1341 (11th Cir. 2000), and plaintiff has not introduced any specific evidence to show his responses were ineffective.  Thus, plaintiff has not produced sufficient evidence to raise a question of fact regarding whether TVA took prompt remedial action after her complaints about Wallace's and Willis' behavior.

Beyond plaintiff's vague assertions that she complained "numerous times," there is no evidence in the record that she complained to any supervisor or member of TVA management regarding Willis' and Wallace's other alleged harassing behavior. (Doc. 25-1 at 9-11). Specifically, plaintiff did not offer any evidence regarding the substance of her "numerous" complaints or when she made the complaints. Thus, plaintiff did not introduce sufficient evidence to raise a question of material fact regarding whether plaintiff's alleged complaints gave TVA notice of Wallace's and Willis' other harassing behavior, such as yelling at plaintiff and keeping job-related information from her. As a result, plaintiff has not shown there is a question of material fact regarding whether TVA can be held liable for Willis' and Wallace's harassing behavior towards her. *See Baldwin*, 480 F.3d at 1302.

5.   <u>Conclusion</u>

As discussed above, plaintiff introduced sufficient evidence to create a question of material fact regarding whether the harassing behavior she experienced was based on her gender and sufficient severe or pervasive to alter the terms and conditions of her employment. Plaintiff also introduced sufficient evidence to establish a question of fact regarding whether TVA can be held liable for employees on her crews calling her derogatory terms on a near daily basis for years. Therefore, TVA's motion for summary judgment is due to be denied as to plaintiff's hostile work

environment claim to the extent the claim is based on plaintiff's allegation that employees on her crews called her gender-specific derogatory terms.

However, plaintiff did not introduce evidence to create a question of fact regarding whether TVA can be liable for Wallace's and Willis' harassing behavior or for the incidents involving the text message sent to plaintiff and the graffiti on the portable toilet near plaintiff's work trailer. Instead, the record establishes TVA took prompt remedial action on the harassment it had knowledge of, and it is not liable for the harassment as a matter of law. As a result, TVA's motion for summary judgment is due to be granted as to plaintiff's hostile work environment claim to the extent the claim is based upon Wallace's and Willis' harassing behavior and the incidents involving the offensive text message and graffiti.

## C.  <u>Count Three-Retaliation</u>

In Count Three, plaintiff asserts a claim that TVA retaliated against her in violation of Title VII. Title VII prohibits employers from retaliating against a person because she opposed a practice prohibited by Title VII or made a charge of discrimination. *See Wells v. General Dynamics Info. Tech., Inc.*, 571 Fed.Appx. 732, 736 (11th Cir. 2014) (citing 42 U.S.C. § 2000e-3(a)). As with a discrimination claim, a plaintiff may prove a retaliation claim based on direct or circumstantial evidence. "The *McDonnell Douglas* burden-shifting analysis applies in cases of retaliation

relying on circumstantial evidence, such as this one." *Brown v. Alabama Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010) (citation omitted).

A plaintiff can prove her *prima facie* case of retaliation by establishing (1) she participated in a protected activity; (2) she suffered an adverse employment action; and (3) there is some causal connection between the two events. *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008) (citation omitted). Once the plaintiff establishes a *prima facie* case of retaliation, the plaintiff creates a rebuttable presumption that her employer acted with unlawful retaliatory intent. The burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Brown*, 597 F.3d at 1181 (quoting *Bryant v. Jones*, 575 F.3d 1281, 1307-08 (11th Cir. 2009)). If the employer makes this showing, the presumption it retaliated against the plaintiff drops out of the case, and the burden shifts back to the plaintiff to show the employer's "proffered reason was merely a pretext to mask discriminatory actions." *Id.* at 1282.

1.   Plaintiff's *prima facie* case

Here, plaintiff asserts TVA retaliated against her in violation of Title VII when it permanently demoted her from her foreman position five days after she filed a claim of discrimination and harassment with TVA's EEO office and that TVA's reason for her demotion was pretext. (Doc. 1 at ¶¶ 80-90). She further asserts employees

accused of similar conduct were not demoted or were reinstated to foreman positions and rates of pay, while plaintiff has not returned to a foreman position since her clearance violation.[16]  (*Id.*).

TVA does not dispute that plaintiff participated in statutorily protected activity by lodging her EEO complaint or that she suffered an adverse employment action when she lost her temporary foreman status and was not given additional foreman assignments after her clearance violation.  (*See* Doc. 22 at 32-33).  Therefore, only the last element of plaintiff's retaliation claim, whether she can prove a causal connection, is at issue.  This element of her claim is construed broadly, and "[t]o establish a causal connection [plaintiff] must show that the decision-makers were aware of the protected conduct and that the protected activity and the adverse action were not wholly unrelated."  *Gupta*, 212 F.3d at 590.  "[C]lose temporal proximity between the [ ] protected conduct and the adverse employment action is [generally] sufficient circumstantial evidence to create a genuine issue of material fact of a causal

---

[16] In her opposition to TVA's motion for summary judgment, plaintiff argues TVA retaliated against her by requiring her to lead jobs without giving her foreman pay and subjecting her to increased drug and alcohol testing.  (Doc. 24 at 18).  In her complaint, plaintiff did not raise any retaliation claim based on allegations TVA required her to lead jobs without giving her foreman pay or based on increased drug and alcohol testing.  (*See* Doc. 1).  The liberal pleading standard for civil complaints under Federal Rule of Civil Procedure 8(a) "does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage."  *Gilmour*, 382 F.3d at 1314 (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)).  Accordingly, the court will not address plaintiff's unpled retaliation claims.

connection." *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) (citations omitted).  However, "temporal proximity alone is insufficient to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct."  *Id.* (citation omitted).

TVA argues plaintiff cannot establish causation as to her demotion because Weatherington, the ultimate decision maker, did not have knowledge of plaintiff's EEO claim when he decided to allow plaintiff's foreman status to expire after the clearance violation.  (Doc. 22 at 32-33).  To support its argument, TVA relies on a declaration from an employee in its Office of Equal Opportunity Compliance (EOC) stating EOC did not inform PSS management, including Weatherington, of plaintiff's EEO allegations until June 19, 2013, when it sent a memo to them about the allegations.  (*Id.* (citing Doc. 21-24 & Doc. 21-25)).

For her part, plaintiff presented evidence Weatherington learned of her EEO claim when she filed it.  (Doc. 24 at 17, 32) (citing Weatherington Deposition, Doc. 25-5 at 9).  Indeed, Weatherington testified he found out about plaintiff's EEO claim "shortly after she filed [it] because Daisy Oakley keeps [him] informed of all that." (Doc. 25-5 at 9).  Plaintiff met with Oakley on May 14, 2013, and filed a formal written EEO Complaint on August 1, 2013.  (Doc. 21-26 at 1-2; Doc. 21-27 at 2).  In

her formal written EEO Complaint, plaintiff states she filed an initial complaint with EEO on May 14, 2013.  (Doc. 21-26 at 3).  Additionally, plaintiff testified that she thinks her EEO complaint "was filed and forwarded" on May 14, 2013.  (Doc 21-6 at 76).  It is unclear from Weatherington's testimony whether Oakley would have informed him of plaintiff's initial EEO complaint on May 14, 2013, or when she filed her formal written EEO complaint on August 1, 2013.  Thus, there is a question of fact regarding whether Weatherington, the ultimate decision maker, had knowledge of plaintiff's protected conduct when TVA demoted her from her temporary foreman position on May 19, 2013.  As a result, the close temporal proximity between plaintiff's meeting with the EEO office and her demotion less than one week later is sufficient to raise a question of fact regarding a causal connection between the two events.  *See Cazeau v. Wells Fargo Bank, N.A*., 614 Fed.Appx. 972, 980 (11th Cir. 2015) (assuming a one-month period between an employee's protected action and an adverse employment action is a sufficiently close temporal relation for an employee to make a *prima facie* case of retaliation).  Therefore, TVA has not established that plaintiff cannot state a *prima facie* case of retaliation to the extent her claim is based on her demotion from her temporary foreman position.

To the extent the retaliation claim is based on TVA not giving plaintiff work as a foreman role after her clearance violation, TVA argues Ables, plaintiff's

supervisor in the transformer services group, was not aware of her EEO complaint during any relevant time.  (Doc. 22 at 31-32).  Indeed, undisputed evidence shows Ables did not learn of plaintiff's claims of discrimination until December 2015. (Doc. 21-30 at 1).  Therefore, plaintiff cannot show a causal connection between her protected activity and not receiving temporary foreman roles after her September 2013 transfer to the transformer services group.  Ables, however, did not become plaintiff's supervisor until her transfer from the roving maintenance organization approximately four months after her clearance violation.  (*Id.*).  TVA did not offer any arguments or cite any evidence to show plaintiff's supervisors in the roving maintenance organization were not aware of her EEO complaint during the time plaintiff was not given work as a foreman in a dual-rate status after her clearance violation and before her transfer.[17]  (*See* Doc. 22 at 31-32).  Thus, TVA has not shown that plaintiff cannot state a *prima facie* case of retaliation to the extent her claim is based on TVA not giving plaintiff work as a foreman in a dual-rate status after her clearance violation and before her transfer to the transformer services group.

---

[17] Evidence cited by TVA shows that Wallace (who directed the day-to-day activities of roving maintenance employees) and Terrell (who had authority to promote or reassign employees) learned of plaintiff's EEO complaint on June 19, 2013, which is during the time plaintiff was not given opportunities to work as a foreman in a dual-rate status for the roving maintenance organization after her clearance violation.  (Doc. 21-1 at 4-5; Doc. 21-24 at 1-2).

2.    TVA's proffered reasons for its actions and pretext

TVA argues it is entitled to summary judgment on plaintiff's retaliation claim even if she can establish her *prima facie* case because it had legitimate, non-discriminatory reasons for its actions after plaintiff's clearance violation and plaintiff cannot show those reasons are pretext.  (Doc. 22 at 32).  TVA proffers the same reasons that it offered in support of its arguments for summary judgment on plaintiff's gender discrimination claim:  (1) plaintiff was demoted from her temporary foreman position because of her clearance violation, and (2) plaintiff was not given work as a foreman after her demotion because roving maintenance did not have another temporary foreman position during the relevant time and plaintiff is less qualified than other employees in the transformer services group.  (*Id.*).

First, TVA asserts plaintiff's clearance violation is a legitimate, non-discriminatory reason for plaintiff's demotion from her temporary foreman position.  (*Id.* at 29, 32).  Indeed, a safety violation is a legitimate, non-discriminatory reason for TVA to demote an employee.  (*See* Doc. 21-4 at 19).  Although plaintiff asserts she should not have been required to act as the PAE and "hold the clearance" at Magnolia, she does not dispute that the clearance violation occurred while she was the PAE at Magnolia on May 19, 2013.  (*See* Doc. 21-6 at 67-68; Doc. 25-1 at 12-14).  Instead, plaintiff quibbles over inconsistencies in testimony from TVA employees

regarding whether Bevis, plaintiff's mentor who she informed about her EEO complaint, was involved in her demotion.  (Doc. 24 at 22-23).  While there is inconsistent testimony regarding whether Bevis helped carry out TVA's decision to demote plaintiff (*see* Doc. 25-5 at 7; Doc. 25-6 at 3; Doc 25-8 at 4), those inconsistencies do not show TVA's reason for demoting plaintiff was false. Therefore, those inconsistencies are not sufficient to show "that a reasonable factfinder could find [TVA's reason for demoting plaintiff] unworthy of credence." *Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004).  Thus, the inconsistent testimony regarding Bevis' role in carrying out the decision to demote plaintiff does not help plaintiff show TVA's proffered reason for demoting her was pretext for its true, retaliatory purposes.

Plaintiff also argues that Weatherington's testimony that he asked Mullins how TVA disciplined employees for similar safety violations in the past and that he did not know if employees are normally demoted after a clearance violation shows TVA's proffered reason for her demotion is pretext. (Doc. 24 at 23). Weatherington testified that he asked Mullins to check what disciplinary action TVA took "on similar violations within TVA." (Doc. 25-5 at 5). However, he also testified that "[a]s far as taking [plaintiff] out of the temporary foreman position, . . . I immediately asked . . . [plaintiff's] supervisor to take her out of that temporary foreman role, that

leadership role, until we got to the bottom of everything." (*Id.*).  Plaintiff does not dispute that Weatherington was the final decision maker regarding her demotion, and Weatherington's testimony that he asked Mullins about additional disciplinary actions taken in response to clearance violations  does not show TVA's reason for demoting plaintiff was false.  As a result, plaintiff has not established a question of material fact regarding whether TVA's reason for her demotion from her temporary foreman position was pretext for its actual, retaliatory purposes.  *See Brooks v. County Comm'n of Jefferson County, Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) ("A reason is not pretext for discrimination 'unless it is shown both that the reason was false, and that discrimination was the real reason.'") (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).

Finally, plaintiff testified that on May 17, 2013, two days before her demotion, she overheard Willis tell two male coworkers that "they would not have to worry about her much longer . . . ."  (Doc. 21-6 at 74).  Plaintiff assumed Willis was referring to her, but even if he was, there is no evidence Willis had any involvement in TVA's decision to demote plaintiff following her clearance violation.  Therefore, Willis' comment does not help plaintiff show TVA's reason for her demotion was pretext for its actual retaliatory intent. *See Mitchell v. USBI Co.*, 186 F.3d 1352, 1355

(11th Cir. 1999) ("[C]omments by non-decisionmakers do not raise an inference of discrimination . . . .").

Because plaintiff's clearance violation is a legitimate, non-discriminatory reason for her demotion and plaintiff has not raised a question of fact regarding whether the reason was pretext, TVA is entitled to summary judgment on plaintiff's retaliation claim to the extent the claim is based on her demotion from her temporary foreman position immediately after her clearance violation.

As discussed in the analysis of plaintiff's gender discrimination claim, TVA offered legitimate reasons for not reinstating plaintiff's temporary foreman position and for not allowing plaintiff to work as a foreman in a dual-rate status after her transfer to PSS's transformer services group, and plaintiff did not show those reasons were pretext. *See* pp. 29-31, *supra*. Thus, TVA is entitled to summary judgment on plaintiff's retaliation claim to the extent the claim is based on TVA not promoting plaintiff back to a temporary foreman position after her clearance violation and not giving her work as a foreman in a dual-rate status after her transfer.

However, TVA did not offer any reason for why plaintiff was not given an opportunity to work as a foreman in a dual-rate status during the four months between her clearance violation and her September 2013 transfer to PSS's transformer services group. *See* pp. 31-32, *supra*. Thus, TVA did not meet its burden of producing a

legitimate, non-discriminatory reason for not allowing plaintiff to work as a foreman in a dual-rate status in PSS's roving maintenance organization after her clearance violation and before her transfer.  As a result, TVA has not established it is entitled to summary judgment on plaintiff's retaliation claim to the extent the claim is based on TVA's failure to allow plaintiff to work as a foreman in a dual-rate status following her clearance violation and before her transfer to the transformer services group.

### 3.   Conclusion

Plaintiff has introduced sufficient evidence to establish her *prima facie* case of retaliation.  TVA produced legitimate, non-discriminatory reasons for demoting plaintiff immediately after her clearance violation and for not giving plaintiff a temporary foreman position after her violation or work as a foreman in a dual-rate status after her transfer to the transformer services group, and plaintiff did not raise a question of material fact regarding whether those reasons are pretext.  Therefore, TVA's motion for summary judgment is due to be granted as to plaintiff's retaliation claim to the extent the claim is based on (1) plaintiff's demotion immediately after her clearance violation, (2) TVA's failure to give plaintiff another temporary foreman position after her clearance violation, and (3) TVA's failure to give plaintiff work as a foreman in a dual-rate status after her transfer to the transformer services group.

TVA did not offer any reason for not giving plaintiff work as a foreman in a dual-rate status in the roving maintenance organization after her clearance violation; therefore, it did not rebut the presumption it acted with retaliatory intent. As a result, TVA's motion for summary judgment is due to be denied as to plaintiff's retaliation claim to the extent the claim is based on TVAs failure to give plaintiff work as a foreman in a dual-rate status in the roving maintenance organization after her clearance violation.

## CONCLUSION

Based on the foregoing, the court finds TVA's motion for summary judgement is due to be GRANTED IN PART and DENIED IN PART.

The court finds that TVA's motion for summary judgment is due to be GRANTED as to the following claims:

(1)    Plaintiff's gender discrimination claim to the extent the claim is based on plaintiff's demotion immediately after her clearance violation, TVA's failure to give plaintiff another temporary foreman position after her clearance violation, and TVA's failure to give plaintiff work as a foreman in a dual-rate status after her transfer to the transformer services group;

(2)    Plaintiff's hostile work environment claim to the extent the claim is based on Wallace's and Willis' harassing behavior and the incidents involving the offensive text message and graffiti; and

(3)    Plaintiff's retaliation claim to the extent the claim is based on plaintiff's demotion immediately after her clearance violation, TVA's failure to give plaintiff another temporary foreman position after her clearance violation, and TVA's failure to give plaintiff work as a foreman in a dual-rate status after her transfer to the transformer services group.

These claims are due to be DISMISSED WITH PREJUDICE.

The court finds TVA's motion for summary judgment is due to be DENIED as to the following claims:

(1)    Plaintiff's gender discrimination claim to the extent the claim is based on TVA's failure to give plaintiff work as a foreman in a dual-rate status in the roving maintenance organization after her clearance violation;

(2)    Plaintiff's hostile work environment claim to the extent the claim is based on is based on plaintiff's allegations that employees on her crews called her gender-specific derogatory terms; and

(3)    Plaintiff's retaliation claim to the extent the claim is based on TVA's

failure to give plaintiff work as a foreman in a dual-rate status in the roving

maintenance organization after her clearance violation.

A separate order in conformity with this Memorandum Opinion will be entered

contemporaneously herewith.

DONE and ORDERED this 24th day of February, 2017.

_____

HARWELL G. DAVIS, III
UNITED STATES MAGISTRATE JUDGE